POTLATCH CORPORATION *v.* ARKANSAS CITY SCHOOL DISTRICT, Ronald Anderson, Curtis Gilbert and V. T. Mosby, Jr.

92-195                                            842 S.W.2d 32

Supreme Court of Arkansas
Opinion delivered November 23, 1992

*Friday, Eldredge and Clark*, by: *James M. Saxton* and *Robert S. Shafer*, for appellant.

*Gibson & Gibson, P.A.*, by: *Bynum Gibson*, for appellees.

DAVID NEWBERN, Justice. This is an appeal from the Circuit Court's review of the 1988 and 1989 *ad valorem* tax assessments on specialized industrial equipment used in a papermill. The mill is owned and operated by the appellant, Potlatch Corporation (Potlatch), at Cypress Bend in Desha County. The case has a complicated procedural history.

The appellee, the Arkansas City School District (School District), claimed that Potlatch was not properly reporting or assessing the value of the equipment located in its plant. The School District, as permitted by Ark. Code Ann § 26-27-317 (Repl. 1992), petitioned the Desha County Equalization Board (Board) to adjust the Potlatch valuation for the 1988 tax year. The County Assessor, Joyce Tanner had accepted Potlatch's 1988 assessment rendition document in which Potlatch stated the value of its personal property for assessment purposes at $10,557,600. That figure was based on a method of evaluation approved by Marvin Russell, a former director of the Arkansas Public Service Commission (PSC) Assessment Coordination Division (ACD). When the School District raised the issue, Ms. Tanner felt unqualified to assess the Potlatch property, and she called upon the ACD for assistance.

The Board's response to the School District's petition challenging the 1988 Potlatch assessment was to uphold the valuation rendered by Potlatch. On the date of that decision the Board was notified by the ACD that the formula utilized by Potlatch to obtain the assessment figure was too arbitrary to establish fair market value for assessment purposes. The School District filed a complaint with the PSC sitting as the State Equalization Board seeking an independent appraisal of Potlatch's personal property. The PSC dismissed the proceeding, finding that there was an

adequate remedy afforded by the appellate process, but ordered the ACD to investigate assessment practices with respect to property used in manufacturing throughout the State.

The School District then appealed the Board's decision concerning the 1988 valuation to the County Court which affirmed the decision upholding the Potlatch valuation. An appeal to the Circuit Court was then filed and docketed as CIV 88-99-2AC.

For the 1989 tax year Potlatch engaged a professional appraiser, Gerald Searle, to assist with preparation of its rendition. Ms. Tanner requested the assistance of the ACD in assessing the property. The figures in the rendition recommended by the ACD were accepted by Ms. Tanner resulting in an increase in the valuation and assessment for Potlatch from its valuation of $52,051,585 to $61,487,104.

Potlatch filed a request for adjustment with the Board which adjusted the valuation to the original figure submitted by Potlatch. The County Court affirmed that decision. An appeal to the Circuit Court was filed and docketed as CIV 89-78-2AC, and the case was consolidated with the appeal of the 1988 assessment.

The Circuit Court (1) held that the 1988 assessment was manifestly arbitrary and ordered reassessment using the method established by the ACD, (2) rejected the methodology applied by Potlatch in it's 1989 rendition, (3) found the estimate of fair market value based on the ACD's recommendation for 1989 was not in error, thereby upholding Ms. Tanner's assessment, and (4) ordered the ACD to assist Ms. Tanner in all future assessments of Potlatch's property.

Potlatch argues on appeal that the Circuit Court (1) erred in ordering its property reassessed for the 1988 tax year using the ACD method; (2) erred in rejecting the Board's adjustment of their 1989 assessment; and (3) erred in ordering the ACD to participate in all future assessments of their property. We find no error and affirm.

## 1. The 1988 reassessment order

### a. Waiver

The differences in the method of assessment used by Potlatch from 1978 to 1988 and that recommended by the ACD and approved by the Circuit Court will be discussed below. To consider Potlatch's first argument with respect to the 1988 assessment, that of waiver, we need only state that the two methods were substantially different. Potlatch contends the School District may not argue in court in favor of a method of assessment it did not present before the Board.

In support of this waiver argument *Acme Brick Co.* v. *Missouri Pacific Railroad Co.*, 307 Ark. 363, 821 S.W.2d 7 (1991), an appeal from the Highway Commission, is cited. The Railroad Co. had filed a petition before the Commission to abandon a railroad spur. In the order granting the petition, the Commission stated that Ark. Code Ann. § 23-12-607 (1987) required it to hear and consider all petitions filed with it for the discontinuance of railroad spurs and that Ark. Code Ann. § 23-12-611 (1987) provided the standard of proof to be used in determining whether the spur track should be abandoned. The order also stated that *City of Caraway* v. *Arkansas Commerce Comm'n*, 248 Ark. 765, 453 S.W.2d 722 (1970), a case involving abandonment of an agency station, was persuasive and controlling in the matter before the Commission.

Upon receipt of the commission's order, Acme Brick Co. moved for reconsideration arguing that "[t]he standard of proof relied upon by the Commission was improper because it is the standard of proof for considering an application to discontinue an agency station, rather than abandonment of a spur. The Commissions' reliance on the standard of proof in Ark. Code Ann. 23-12-611 was legal error." Because § 23-12-611 and the *Caraway* case both involved agency stations rather than spurs, Acme Brick Co. claimed the Commission erred in relying on them to determine the standard of proof applicable to the spur petition. We held Acme Brick Co. could not complain in court about the standard of review used by the Commission having failed to inform the Commission of the correct standard.

██ This case differs in several significant ways. First,

Acme Brick Co. could have learned the proper standard of review through legal research. With respect to standards for determining value of property to be assessed, there is no single or "proper" assessment method to be presented. All concede that there are various ways of going about assessing the value of property. The School District's point was to require use of some method based on actual value in compliance with the Ark. Const. art. 16, § 5.

Second, the ACD had not developed a single formula prior to the 1988 assessment, therefore, there was no single, acceptable method to apply to valuation to proffer.

Finally, with respect to the 1988 assessment, the School District argued Potlatch was not fully disclosing the extent of its personal property, and that the formula it was using resulted in an assessment based upon only 10% of market value. The School District asked both the Board and the County Court to require use of a formula which would arrive at a fair market value in accordance with the Constitution. That was sufficient to apprise these entities of the specific objections raised to the Potlatch valuation.

### b. The Russell formula

Next, Potlatch argues that, as the method it used in computing the 1988 figures was supported by substantial evidence in the form of the testimony of Marvin Russell, the Court was required to affirm the Board rather then engage in an assessment of property. Mr. Russell had recommended a formula which permitted Potlatch in its first year of operation to take the actual cost of the property, divide that in half and declare 20% of that figure as the taxable value, yielding a valuation equal to 10% of actual cost. This same figure was thus declared each year subject to certain adjustments as equipment changes occurred. Russell testified that this formula would give level expenses for the company, level income for the taxing unit, and would also yield more money than alternative methods. He stated on cross-examination that the 50% formula was based on the use value rather than market value of the equipment and was directly related to income producing potential.

Potlatch argues that no one testified that this formula produced a valuation unrelated to fair market value, but that is

not so. In his deposition, Larry Crane of the ACD specifically said "any way you play it, an arbitrary fifty percent would not reflect fair market value for any but that one coincidental point in time it just happened to really be that." He continued in his deposition to characterize the 50% formula on a brand new facility as ridiculous. Even Mr. Searles, Potlatch's expert, testified that the "fifty percent of original cost method employed from 1978 through 1988 is not a recognized method" and the "fifty percent method does not have any acceptance in the world of appraisal."

This defense of the 50% valuation ties in with the argument that the Circuit Court erred in substituting the ACD formula for the 1988 tax year because, Potlatch asserts, affirmance of the judgment of the Board and County Court was required if there was any substantial evidence to support it.

■■ *Tuthill* v. *Arkansas County Equalization Board*, 303 Ark. 387, 797 S.W.2d 439 (1990), is cited for its description of the agency and judicial roles as follows:

> The Assessment Coordination Division of the Public Service Commission is given the power of supervision and control over the several county assessors and boards of equalization and review in order that assessments of property shall amount to true market value. Ark. Code Ann. 26-24-101 and 26-24-102 (1987). To this end, the Assessment Coordination Division annually publishes a manual to be used by county appraisers. That manual recommends the use of three methods to arrive at a true, or market, value. They are (1) comparable sales, (2) capitalization of income, (3) cost less depreciation. It is best that an assessor use two or more of the methods as a gauge of the market value. *Board of Equalization* v. *Evelyn Hills Shopping Center*, 251 Ark. 1055, 476 S.W.2d 211 (1972).

> Because of the separation of powers doctrine, it is not within the province of state courts to assess property. *Cook* v. *Surplus Trading Co.*, 182 Ark. 420, 31 S.W. 521 (1930). Courts can only review the assessments and reverse them and send them back to the executive department when they are clearly erroneous, manifestly excessive, or confiscatory. *St. Louis - San Francisco Ry. Co.* v. *Ark. Public Serv. Comm'n*, 227 Ark. 1066, 304 S.W.2d

297 (1957). We have said that we will reverse property assessments only in the "most exceptional cases." *Jim Paws Inc.* v. *Equalization Bd. of Garland County,* 289 Ark. 113, 710 S.W.2d 197 (1986). The burden of proof is on the protestant to show that the assessment is manifestly excessive or clearly erroneous or confiscatory.

■ Potlatch is correct in stating that it is not the province of courts of law to make assessments. That is in the hands of the assessors, the ACD, the equalization boards and finally, the County Courts. However, the review of the Circuit Court is pursuant to Ark. Code Ann. § 16-67-207 (1987) which provides "the circuit court shall proceed to try all appeals from county courts de novo as other cases at law." The record before the Circuit Court showed beyond debate that the 50 % formula was not based on market value and was therefore violative of Ark. Const. art. 16, § 5, which states:

(a) All real and tangible personal property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property for which a tax may be collected shall be taxed higher than another species of property of equal value. . . .

Clearly the formula which was the basis for the 1988 valuation was erroneous, and the Circuit Court was correct in remanding the matter for a new valuation based on application of a proper formula as recommended by the ACD.

### 2. The 1989 assessment

In this argument Potlatch again asserts that the Circuit Court overstepped its constitutional boundaries in rejecting the 1989 adjustment by the Board as affirmed by the County Court. Again cited is authority to the effect that the Circuit Court's *only* role is to determine that the rendition is not clearly erroneous, excessive, or confiscatory in concluding that the Court's order substitutes itself for a purely executive function.

Ms. Tanner had asked for the help of the ACD which then furnished her with a detailed proposed assessment of the Potlatch equipment in accordance with standards published in the ACD

manual for assessors of October 1988. It was her duty to follow the ACD recommendation. *See* Ark. Code Ann. § 26-24-102 (Repl. 1992); *Tuthill* v. *Arkansas County Board of Equalization, supra.* Yet the Board and the County Court rejected Ms. Tanner's assessment, substituting that proposed by Potlatch without comment. The Circuit Court reinstated Ms. Tanner's assessment. While that goes beyond merely reversing the County Court and remanding for further consideration, it is not the same as assessment of the property by the Circuit Court based upon raw data produced in evidence before it. The Court did not exercise an executive function; it merely recognized and reinstated the original executive decision by determining that the judicial and quasi judicial bodies which had reviewed it were in error.

The Circuit Court had before it testimony of ACD officials explaining the age-life method recommended to Ms. Tanner and the testimony of Mr. Searles explaining the 16-year life method upon which the 1989 assessment figure submitted by Potlatch and adopted by the Board and the County Court was based. Mr. Searles testified that his method was the one being used statewide by other paper mills. On cross-examination, he admitted he had hard (written) evidence only that it was in use by one other paper mill and that his information with respect to other paper mills had been gathered by telephone from people, some of whose names he could not remember. More important, however, the propriety of the Searles method was questioned, and the Circuit Court could well have concluded not only that the ACD method used by Ms. Tanner was a more accurate assessment tool but that the Searle method was clearly erroneous in its determination of value. The Circuit Court correctly noted evidence that the Searles method was to be used only in combination with "trending," a means of taking into account the state of the economy, a factor not being used with the 16-year life method by Mr. Searles.

Potlatch responds that the failure to include trending is irrelevant because other paper mills using the Searles 16-year life method are not using trending, thus there is uniformity. Our view is that uniformity is, of course, desirable, but it becomes irrelevant when the issue, as in this case, is not equal protection but accuracy of the assessment method to produce that which the Constitution requires, i.e., an assessment based upon the actual

value of the property being assessed.

■ Under these circumstances, we can hardly say the Circuit Court's determination that Potlatch had not established before the Board or the County Court that Ms. Tanner's assessment was in error was incorrect. Nor can we say that, to the extent his decision was factual, it was clearly erroneous. Ark. R. Civ. P. 52(a).

### 3. Participation in future assessments

■ Potlatch argues the Court erred in ordering the ACD to participate in future assessments of their property. Ms. Tanner clearly indicated her inability to conduct the assessment of Potlatch, and the ACD is charged by statute with the duty to assist and supervise the assessors. The order of the Circuit Court merely states an obligation which already exists. There was no error in the decision.

Affirmed.